# EPHRAIM WILLOW CREEK IRR. CO. et al. v. OLSON et al.

No. 4469.   Decided April 27, 1927.   (258 P. 216)
Rehearing Denied July 15, 1927.

96

*A. W. Jensen,* of Ephraim, and *A. H. Christenson,* of Provo, for appellants.

*Lewis Larson,* of Manti, for respondents.

THURMAN, C. J.

This action was instituted by plaintiff the Ephraim Willow Irrigation Company and numerous individual plaintiffs to quiet their title to the use of the waters of Willow creek, in Sanpete county, for irrigation, stock-watering, and culinary purposes.

It is alleged in the complaint that the volume of water in said creek is about 90 second feet, and that the greatest volume of flow is generally reached about the 25th day of May of each year, and that sometimes the water reaches a volume of 105 second feet; that at about that time the water begins to recede until about the 15th day of June of each year when the volume of water is only about 30 second feet, all depending upon the quantity of snow in the mountains and the rainfall during the season. The complaint alleges that in 1861 the stockholders of plaintiff corporation and the other plaintiffs and their predecessors in interest, by means of dams and ditches constructed by them, diverted all of the water of said creek for irrigation, culinary, and stock-watering purposes, and that ever since the year 1875 plaintiffs and their predecessors in interest have beneficially and economically used all of said waters except when their use has been unlawfully interfered with by the defendants. It is then alleged in the complaint that the defendants during various years, at various times, have diverted portions of said waters from a tributary of said creek known as the "Manti Mountain stream," or "Parley's Canyon stream," and have prevented the water so diverted by them from reaching the plaintiffs, and that said diversion by said defendants has been wrongful and in violation of plaintiffs' rights and to their great and irreparable injury. Plaintiffs further allege that defendants threaten

to continue to interfere with the rights of plaintiffs, as above stated, and allege upon information and belief that the defendants will, unless restrained and enjoined by decree of court, continue to wrongfully and unlawfully divert said water and interfere with plaintiffs' rights thereto to their great and irreparable injury. Plaintiffs pray that their rights to said waters be adjudicated, and that it be determined that they are the owners of the right to the use of all of said waters for the purposes aforesaid and that defendants have no right or title thereto, and that they be enjoined and restrained from in any way diverting or using said waters or interfering therewith. Plaintiffs also pray for general relief.

Defendants, answering, admit the description of Willow creek, as alleged in the complaint, and admit that they have diverted a portion of the waters of the said Manti Mountain stream, but deny each and every allegation of the complaint not admitted in their answer. For a further and separate answer defendants allege that they are the owners of the right to the use and entitled to the right to use one-fourth of one second foot of the waters of said Manti Mountain stream for the purpose of watering sheep, cattle, and horses. For a further answer and by way of counterclaim, defendants allege that for more than 40 years they and their predecessors in interest have been the owners of and entitled to the possession of 2,690 acres of grazing land situated in certain sections and townships described in the answer, on what is known as the "East Mountain," lying east of and between the cities of Manti and Ephraim; that Manti Mountain stream is a natural stream of water arising in the Wasatch Mountains and is a tributary of Willow creek, described in plaintiffs' complaint. The answer further alleges that the defendants and their predecessors in interest, in the ownership of said lands, for more than 40 years next prior to the commencement of this action, during the months of May, June, July and August of each year, grazed large numbers of cattle, horses, and sheep upon said lands, and for

that purpose it was and is necessary to divert from said Manti Mountain stream one-fourth of one second foot of water and run the same down over and upon said lands for the purpose of watering said sheep, cattle, and horses; that in the year 1885 said defendants and their predecessors in interest made a ditch from near the head of said Manti Mountain stream down to what is known as "Pretty Valley" for a distance of about 1¼ miles; that they completed said ditch in the spring of said year and diverted one-fourth of one second foot of the water of said stream and conducted the same by means of said ditch down to said Pretty Valley, where they impounded the same in a small reservoir for stock-watering purposes. The necessity of said water for said purposes is alleged, and it is further alleged that ever since the spring of 1885 the defendants and their predecessors in interest annually during the spring and summer seasons have continued to divert and use said water in the manner stated for the aforesaid purposes; that said diversion and use of said water has been adverse, open, notorious, peaceable, exclusive, under claim of right as against all the world, and continuous from season to season each and every year, since and including 1885. It is also alleged that said use of said water by said defendants and their predecessors in interest, during all of said time, was well known to plaintiffs and was prior in time of appropriation to the rights of the plaintiffs and began at a time when there was surplus public water in said Manti Mountain stream and in said Willow creek and when said water was subject to appropriation by the use thereof.

Defendants pray that their right to the use of one-fourth of one second foot of the waters of Manti Mountain stream, during the months of May, June, July, and August of each year, be quieted in defendants. Defendants also pray for costs and for general relief.

Plaintiffs, in reply to defendants' cross-complaint, deny each and every allegation thereof, except as alleged in plaintiffs' complaint.

It thus appears from the pleadings that plaintiffs claim title to the water rights in question by prior appropriation, and that the defendants claim by prior appropriation and adverse use.

The issues were tried to the court without a jury. The court found in favor of the plaintiffs on the issue of prior appropriation and in favor of defendants on the issue of adverse use. Conclusions of law and decree were entered in accordance with the findings. Plaintiffs moved for a new trial, which was denied by the court. From the judgment entered plaintiffs appeal and assign as error the admission of evidence, over plaintiffs' objection, certain findings of the court, and the order denying plaintiffs' motion for a new trial.

Defendants do not challenge the findings of the court as to plaintiffs' prior appropriation of the water. The only question involved is the defendants' right by adverse use.

The court found that in the year 1885 Peter Olson, David Olson, and Lewis Olson diverted on-quarter of one second foot of water from the Manti Mountain stream, and that the same was used by the defendants and their predecessors in interest during the months of May, June, and July of each and every year from 1885 to 1897, both years inclusive, openly, peaceably, adversely, uninteruptedly, and exclusively under a claim of right as against the plaintiffs and their predecessors in interest and all the world, and that said use of said water was at all times well known to the plaintiffs and their predecessors in interest.

Defendants claim title under the provisions of section 2780, Comp. Laws Utah 1888, which among other things, provides that a primary right to the use of water for the purposes therein mentioned shall be deemed to have vested and accrued "whenever any person or persons shall have had the open, peaceable, uninterrupted, and continuous use of water for a period of 7 years." After the passage of this statute this court, in 1898, in the case of *Smith* v. *North Canyon Water Co.*, 16 Utah 194, at page 202, 52 P. 283, 286,

announced the following conditions as necessary to establish a title to water by adverse use:

"The right of the defendant in the water would become fixed only after 7 years' continuous, uninterrupted, hostile, notorious, adverse enjoyment; and, to have been adverse, it must have been asserted under the claim of title, with the knowledge and acquiescence of the person having the prior right, and must have been uninterrupted."

We assume that the excerpt we have quoted from the opinion in the Smith Case was intended to be an interpretation of the statute above quoted, for the statute was undoubtedly in force when the opinion was rendered.

We refer to the finding of the court and the law defining the adverse use of water in this connection, for we are impressed with the view that whether the plaintiff had knowledge, or adequate means of knowledge, of the defendants' use of the water and that they were asserting an adverse claim thereto are, perhaps, the controlling questions in the case. They were undoubtedly the most hotly contested issues presented by the pleadings.

It is earnestly contended by respondents that, as far as their counterclaim is concerned, this is an action at law and not an action in equity; that this court therefore has no power to review the evidence for the purpose of determining its weight. As to this question, it is perhaps sufficient to say that defendants by their counterclaim seek to have their title quieted and pray for general relief. Their counterclaim calls for such relief as is available only in equity. They do not pray for damages. The only relief they can possibly obtain under their counterclaim, as drawn is some form of equitable relief. If we were compelled to hold that defendants' counterclaim is cognizable only at law, then we would also be compelled to hold that it does not state facts sufficient to constitute a cause of action. The form of action adopted by both plaintiffs and defendants makes it essentially a case in equity. But, aside from that,

the type of wrongs complained of here, whether by the plaintiffs against defendants for diverting water from the Manti Mountain stream, claimed by the plaintiffs, or by the defendants against the plaintiffs for turning water claimed by defendants out of their ditch and depriving them of the use thereof, is such in which equity alone can afford an adequate remedy. It is true that either party in an action at law might sue for each particular interference with the water and recover such damages as he was able to prove, but this would require successive suits—a multiplicity of actions—which in itself renders it a case of equitable cognizance. It appears to the court that for cases of this nature equity affords the only adequate remedy.

It therefore becomes necessary to review the evidence, as far as necessary, in order to determine the facts as well as the law applicable thereto. ■

Peter Olson, a brother of defendant David Olson, testified for defendants that in 1883 or 1884 he was running cattle up in the vicinity of the Manti Mountain stream; that in one of those years he, David, and Lewis (another brother) dug a ditch from the Manti Mountain stream down to Pretty Valley and conducted water thereto for the purpose of watering their cattle. Witness also made a desert entry of land which was one of the purposes of making the ditch. This was in the month of May or June. The ditch was a mile or more in length. It was 8 or 10 inches in width at the bottom along the sidehill where it crosses the ridge, and was about 6 inches in depth. It was made with pick and shovel from the creek to the top of the ridge and the remainder was made with a plough. They turned water into the ditch that year immediately after completing the ditch. The water ran down to Pretty Valley. Witness continued there until 1888. His desert entry was abandoned. He thought there was water in the ditch in 1885 to 1888. Their cattle watered there, and witness thought the water was necessary for the cattle. Their cattle were grazing in Pretty Valley and south of it, and the water was used during May,

June, and July. Other people had cattle up there and used the water. Witness sold his cattle to David and Lewis and left in 1888. Peter Madsen, who is now dead, ran some cattle up there. Witness could not remember any one now living who was running cattle up there at that time. Witness knew that Willow Creek was used on the lands down below, but he never saw any of those people up there. He never saw anybody up there but himself and brothers. He never saw Peter Madsen up by Parley's Canyon. The only ones he remembered were his brothers, Dave and Lewis. He did not know that anybody knew they had the water except his brothers and Peter Madsen. The country up there was public domain.

Lewis Olson, a witness for defendants, 58 years of age, testified he helped dig the ditch in 1885. He was acquainted with the "Munk" ditch situated 200 yards further down the stream. Witness also ran some cattle there with Peter's and Dave's. Peter sold out to witness and David in 1888. They commenced to run sheep in 1886 or 1887. The water was necessary for the stock. They used it there each and every year while witness was there. He had not been there for the last 15 years. They had to clean the ditch out, more or less, because the cattle would tramp it out. They would usually take the water out in May and aimed to keep it until they would move the stock to a higher range. Never knew of the water being turned off except by the cattle or by a flood. He was there continuously in every season from 1885 until 1896, and nobody ever molested them. The water would run there a part of the time in the early season. In 1896-97 quite a few people became interested up there. They constituted what was called the East Mountain Cattle Company. Witness and David were members of the company with 18 or 20 others. In 1910 witness sold his interest to his brother Hans, and Hans sold to David and his sons. In 1885 witness lived at Manti. There were not many grazing cattle on the East Mountain when they went there. Peter Madsen was one of the first along with them. When they made the

ditch, it took nearly a week. They found oak brush and other brush and had to dig it out until they got across the hill. Peter H. Madsen, one of the irrigators, knew they made the ditch. Witness thought he was one of the officers of the south side. His son also knew about it. Joe Green and some of the others would be the next to know about it. Witness never talked to any of them concerning it.

David Olson, defendant, testified he was 58 years of age and resided at Manti. He helped his brother (Peter) take out the water from the Manti Mountain stream. Witness had a few head of cattle that watered from the stream. They made the ditch in 1884 or 1885. They made it down to Pretty Valley the first year. They used the water every year after that through the ditch. Some change was made in the ditch later by the East Mountain Cattle Company. Witness said they used the water in May, June and July and sometimes in August. He joined the East Mountain Cattle Company and helped enlarge the lower part of the ditch. Some one turned the water off from that company. It was turned off several times and a notice posted up. The company sold out their land to witness and Lewis. Witness was up there and used the water every year until about 9 years ago. He observed others water there. No one ever came there and disputed their right until after they bought the company out. Witness mentioned the names of several persons who called on him from below and disputed his right to the water after the cattle company was organized. He told them how the defendants had obtained the water, first, by constructing the ditch, and then by buying Peter's right and afterwards buying from the East Mountain Cattle Company. Witness said N. O. Anderson, water master, 'phoned him and ordered him to "turn the water loose." That was 5 or 6 years ago. Witness did not remember what he did, but if he turned it off it was because he was through with it. He and his two sons now own all the water. There is no usual trail up there and no wagon road. There was a wood road into Pretty Valley. People did not ride there much

looking for cattle. It was an unusual place to go in those days. No people had cattle to amount to anything. It was unusual to see any one up there. People did not go there much until the cattle company was organized. He saw Nels Madsen and his father up there. Nels Madsen and his brother-in-law and a witness for defendants. Witness could think of no other person up there where the ditch was until the men who organized the cattle company came up there to explore. He did not remember telling any one they had a ditch there, nor did he remember of seeing any one of the water users up there until the cattle company "started in." Witness had no recollection of the water being turned off very often. At times they threw rocks in and shut it nearly all off. Witness said he lived among the water users and had never told them he claimed a water right up there, except he thought he told Jake Keller a year or 2 ago. He said he had no occasion to tell any one. Witness did not remember any one besides Peter Madsen and his son, Nels, who knew of their taking the water or claiming a right thereto prior to 1897. He stated that he and Perry Olson now own all of the water.

Nelson P. Madsen testified for defendants that he was 51 years of age and one of the plaintiffs. He was familiar with the Manti Mountain stream, Pretty Valley, and the Olson ditch. Had been so acquainted ever since he was 7 years old. His father had interests there during all that time. Witness had occasion to go up there often in the earlier years. The Olsons made the ditch in 1885. He saw the ditch at that time. He and his father were up there the first morning the Olsons turned the water out. His father was then an owner in Willow creek and irrigated under that system. Witness thought his father was a director of the South Willow Creek Irrigation Company at that time. Witness was up there for about 5 years after that herding cattle. During these years water was running in the Olson ditch every season during the early part. In the latter part of the season, their "stuff was not usually on that section of

the mountain." In 1889 or 1890 witness saw a man up there representing the Ephraim Irrigation Company.

"Q. Who was that? A. He said he was the water master of the Ephraim division. I don't remember his name.

"Q. Can you describe the man? A.Why, he was a man past middle age. He had a chin beard and a mustache and was slightly gray.

"Q. Where did you meet this man? A. In what is known as the hole.

"Q. Is that near the point of diversion of the Olson ditch? A. Yes, sir.

"Q. What conversation, if any, did you have with him about the Olson ditch?"

Mr. Christenson, attorney for plaintiffs, interposed the following objection:

"I object to that as incompetent, irrelevant, and immaterial; certainly, if there was a conversation—if it should develop—'

Mr. Larson, attorney for defendants, said:

"A man that represents himself to be the water master.

"Mr. Christenson: Well, we should have some opportunity to run it down. There should be somebody certain.

"The Court: The objection is overruled."

The witness answered:

That man reported to us that it had been reported to him that we had the entire stream running out from the—over the face of the mountain, and that he came up there to investigate."

Witness then stated that it was about the 1st of August. There was a very small stream in the ditch. The man looked at the stream and said:

"He couldn't—it wouldn't do anybody much good or hurt the irrigation."

The further testimony of this witness relates to what occurred while he was a member of the East Mountain Cattle Company after 1896. It is therefore immaterial, as the

evidence is conclusive that after that time the use of the water by the defendants was so frequently interrupted as to prevent the acquiring of title by adverse use.

As to the question of adverse use, the plaintiffs' witnesses, in substance, testified as follows:

Lauritz Nielson, 51 years of age, testified he was acquainted with defendant David Olson, also with the Manti Mountain stream and Pretty Valley; that he had been acquainted with said stream and Pretty Valley since 1890 by herding cattle in the mouth of Willow Creek Canyon and on the north end of Manti Mountain; that he herded there from 1890 until 1896. He saw water taken out of the stream in 1897 running down to Pretty Valley in May or June. When he got home, he reported it to his father, who was a member of the committee on the north side of Willow creek. Witness was sent up the next day to turn the water out. He saw the water running there afterwards and turned it off. Witness never noticed any ditch there or any water running there prior to 1897. He camped there in the spring of the year for 4 years in the mouth of Willow Creek canyon and herded cattle. The cattle went over to the north end of Pretty Valley, which is the "length of 2 or 3 forties from where the ditch is taken out." It is quite steep from Pretty Valley up to where the water is taken out. It runs mostly through oak brush. Never saw stock watering towards the north end of Pretty Valley. There was no water there from 1892 to 1897. Witness and his father ran about a hundred head of cattle, and he would go into Pretty Valley nearly every day while he camped at the mouth of Willow Creek. That would be in the months of May and June. He was looking after the cattle. He saw David and Lewis Olson there in 1890. They had cattle there. He never saw any ditch there with water in it during those years. A man crossing a ditch with water in it would see the ditch. If there was no water in the ditch, he might not see it. The land in spots is covered with dense maples and undergrowth. There are bare spots. He could probably ride close by the

ditch and not see it. There was no ditch there with water in it between 1890 and 1897 that he knew of. He thought he could ride from where he camped to the point reached by the ditch in Pretty Valley in about 30 minutes.

S. P. Jensen testified he was 81 years of age. Knew the Manti Mountain stream ever since 1868. Was water master on Willow creek from 1868 to 1889. In 1874 or 1875, as water master, he went up to Manti Mountain stream with Peter Madsen, father of defendants' witness Nelson P. Madsen. That was the first part of June. The Munks had just made a ditch and turned the water. Witness told them to turn the water down the stream, and they did as he requested. The water ran down to Willow Creek. He never knew that Olson made a ditch up there in 1885. He had not seen water running into Pretty Valley, but had seen water standing there.

Jacob Keller testified he was 57 years of age. He has a farm under Willow creek. Is acquainted with Parley's Canyon stream. It is quite a stream during high water. He ran cattle up there in 1890. Is acquainted with Pretty Valley. It is about three-fourths of a mile south from Willow creek. It is from 5 to 10 acres in area. Witness was there many times from 1890 up to 3 or 4 years ago. He developed water in the south end of Pretty Valley across the ridge from Parley's Canyon. There was no ditch there between 1890 and 1897 that carried water from Parley's Canyon to Pretty Valley. He and others, including David Olson, constructed a ditch there in 1897. They had prospected around there for water to water their cattle. When they made the ditch in 1897 there was no other ditch there, but there had been some work there at a remote period. "You could see a line there running through but couldn't tell whether it was started for a dugway or to make a ditch. It was all leveled out and the brush has been grubbed. It appeared to be an old working. The brush was service berry and chaparral, and stuff like that." In 1897 when they constructed the ditch they did not know of any such thing as an Olson

ditch. Witness remembered of hearing of the Munk ditch. David Olson was there. Witness did not remember of him saying anything about the Olson ditch and knew nothing about it at that time. There was no evidence of any ditch running down the side of the mountain. Those who made the ditch in 1897 had made homestead entries on the mountain and owned the land. They were notified to let the water alone, and they ceased using it. Mr. Olson bought them out. Witness never heard David Olson claim, or heard of him claiming, any water there before they made the ditch in 1897. They dug the ditch along the same place where he saw the line running through. From 1890 on witness was on parts of the mountain every spring. Every time they rode they would have to go into Pretty Valley because they found cattle in that direction.

Charles Wintch testified he was 69 years of age. Was acquainted with Parley's Canyon. Was there hunting horses in 1874. Saw the water. There were no ditches there. Went up again in 1893. He was one of the irrigation committee to oversee the water. He was water master on the south ditch. They thought they would go up and build a reservoir in Pretty Valley. They found there was not enough water there to justify them in doing anything. While up there he noticed the old ditch that Munk had made in 1874. There was an old mark of the ditch at that time. He saw a small pond of water in Pretty Valley that had come from snow melting on the sides of the mountain. It did not come through a ditch from Parley's Canyon.

Joseph A. Nielson testified he was 45 years of age. Was acquainted with the defendants. Had known David Olson 25 years. Was acquainted with Manti Mountain stream in Parley's Canyon. Had known it about 29 years. He rode there, when he was about 15 or 16 years of age, for cattle. Had occasion to visit Pretty Valley. Never saw any water there taken out of Manti Mountain stream until the cattle company was organized in 1897 or 1898. It would be impossible for a stream to be there without witness seeing it.

James B. Tatton testified he was 62 years of age. Was acquainted with Pretty Valley and Manti Mountain stream. He had been over the Manti Mountain off and on since he was 14 years of age. Was one of the cattle company. Was there when they made the ditch. Saw the country before they started to make it. He saw no ditch there before. He saw a trail along the mountain side only under some maples where the sheep had not been. Witness said he had a good deal of experience in farming and making ditches. He could see there had been a ditch there, but there was no ditch— only the trail "tromped up." In his judgment, there had been no ditch there for 6 or 7 years; it might have been more. He was told there had been a ditch there. There could not have been water running there the year before he first saw it. It was a hard beaten trail.

Charles A. Cox testified he was 68 years of age. Was one of the East Mountain Cattle Company. Before that he ran sheep around in that country for 4 or 5 years. Was acquainted with Manti Mountain stream. He saw the country, where the cattle company constructed a ditch, before the ditch was made He saw what looked like a trail. He imagined there had been a ditch there 6 or 8 years before. He had made ditches and had seen ditches worn down and had seen them built up. He had given his best judgment. He had run horses and sheep there from Pretty Valley south over the side hill during the time he had mentioned and never saw any water in Pretty Valley. If there had been any, he would have seen it.

At the close of the evidence, in pursuance of a stipulation between counsel, the court viewed the premises and points referred to in the evidence.

Appellants assign as error the admission of the testimony of the witness Nelson P. Madsen as to the statement made by the unknown person who represented himself to be the water master of the Ephraim division. The objection urged was that it was incompetent, irrele-

vant, and immaterial. In the opinion of this court, it was clearly incompetent. It was hearsay evidence, tending to show that the plaintiffs and their predecessors in interest had notice that defendants were using the water. That, as before stated, is a vital issue in the case, and, in our opinion, the controlling question. The statement of the party representing himself to be the water master of Ephraim division was also objectionable. The rule is general, with very few exceptions, that the declarations of an alleged agent made out of court are inadmissible to prove his agency, where the question of agency is material. The question here is not within the exception. Although the representation that he was water master of Ephraim Irrigation Company was not specifically excepted to, it was so obnoxious to the general rule that we hold it to be of no probative value. The error of the court in admitting the testimony referred to is clearly prejudicial unless the other evidence is the case, standing alone, justifies the finding that plaintiffs had knowledge that defendants were adversely using the water.

As we have stated the substance of the material parts of the evidence it will not be necessary here to refer to it at length. The defendants and their witnesses testified positively to the construction of their ditch, 8 or 10 inches wide, and 6 inches in depth, from the Manti Mountain stream across the ridge and down to Pretty Valley in 1885. They testified to the use of the water therein in May, June, and July in each and every year without interruption until 1897 when the cattle company was organized. They did not know of any one who knew of their using the water during that entire period, except the Olson brothers and Peter Madsen and his son, Nelson. They never told anybody they were using the water or were claiming the right to use it, and, to use their own expression, they never had occasion to. It appears that Peter Madsen and his son, Nelson, used the water, and to that extent were interested in having the water run in the Olson ditch.

The evidence on the part of plaintiffs tended to show that except Peter Madsen, who was dead when the case was tried, and his son, Nelson, who testified he was a plaintiff, none of the plaintiffs ever knew that defendants were using the water or claiming a right thereto. So that there is no evidence in the case of notice to the plaintiffs of the defendants' adverse use except such as was afforded by the nature and location of their ditch, the manner in which it was maintained, and their manner of using the water. As to those matters the plaintiffs introduced considerable evidence. The testimony of several of their witnesses tended to show that from 1890 to 1897 there was no ditch in use conveying water from Manti Mountain stream to Pretty Valley. Some of the witnesses saw no semblance of a ditch at all. Others saw the markings of an old trail or what might have been a ditch 6 or 8 years before. They all testified, however, that there was no ditch conveying water from the Manti Mountain stream to Pretty Valley until 1897 when the cattle company made a ditch for that purpose.

There are certain features of the case of deep significance. The court found that plaintiffs had not only appropriated all of the waters of Willow creek as early as 1868, but that the entire flow of said creek was insufficient for the proper and economical irrigation of their lands, and that plaintiffs could and would, if water were available, use economically and beneficially much more water than flows in the creek. In these circumstances, it taxes credulity to believe that plaintiffs would not have discovered defendants' use of the water during a period of 12 years, if such use had been open, visible and notorious—such use as is necessary to establish a right by adverse use. We do not hold that defendants should have used the water continuously every month in the year, but we are of opinion it was at least incumbent upon them to maintain their ditch open and visible, so that a person of ordinary intelligence could distinguish it as a ditch used for the purpose of conveying water. It was not incumbent upon defend-

ants to disclose their intentions to the plaintiffs by verbal or written declarations, but, if they chose to remain silent in that respect, it was all the more incumbent upon them to maintain open physical conditions in the operation of their ditch and use of the water, so that their intention would be manifest to all whom it might concern, especially the plaintiffs, whose rights they were invading. As said by the court in *Smith* v. *Duff*, 39 Mont. 378, 102 P. at page 982, 133 Am. St. Rep. 582:

"Because of the nature of the right, the elements constituting it must be proved satisfactorily and unequivocally; and no doubtful inference will suffice."

The excerpt hereinbefore quoted from the opinion of this court in *Smith* v. *North Canyon Water Co.*, 16 Utah 194, 52 P. 283, states the rule so clearly we are constrained to quote it again in this connection:

"The right of the defendant in the water would become fixed only after 7 years' continuous, uninterrupted, hostile, notorious, adverse enjoyment; and, to have been adverse, it must have been asserted under the claim of title, with the knowledge and acquiescence of the person having the prior right, and must have been uninterrupted."

The presumption is against the acquisition of title by adverse use. *Spring Creek Irr. Co.* v. *Zollinger*, 58 Utah 90, 187 P. 737.

The following from 1 Words and Phrases, First Series, at page 227, is a clear statement of the rule:

"To constitute 'adverse possession' the possession must be actual, for otherwise there is no disseisin, and the real owner remains in possession, actually or constructively. It must be continuous, for upon its cessation or interruption the possession, in contemplation of law, is again in the holder of the legal title. It must be hostile to the real owner, and with the intention to claim the land adversely to him. This claim must be manifest from the nature or circum-

stances of the possession, so that the owner may be informed of it, and that he shall not be misled into acquiescence in what he might reasonably suppose to be a mere trespass when he would not have acquiesced in the assertion of a right adverse to his own title."

We know of no well-considered case holding contrary to the rule above stated.

There are other features of the case inconsistent with the claim of title by adverse use. Notwithstanding the East Mountain Cattle Company succeeded to the rights of the Olson brothers in 1896 or 1897—the Olsons becoming members of the company—it does not appear that any other member of the company ever heard of the Olsons claiming any right to the water prior to the organization of the company. This is so unusual and contrary to common experience in human affairs as to be of more than ordinary significance.

If the quantity of water used by the defendants had been so considerable as to justify an inference that plaintiffs below ought to have noticed a diminution in the flow of the creek, it would be a strong circumstance tending to show that plaintiffs had knowledge that defendants were using the water. But it can hardly be contended that one-fourth of a second foot of water diverted from a creek flowing from 30 to 90 second feet would be distinguishable so as to serve as notice to the plaintiffs. Such diminution, if observed at all, might easily be attributable to natural causes.

According to the findings of the court, whatever rights the defendants may have acquired to the use of the water were based upon their use between 1885 and 1897, inclusive. After that date their use was interrupted by the plaintiffs from time to time until the commencement of the action.

While the court is clearly of the opinion from the evidence in the record that the defendants made the ditch in question and used the water therein until about 1889, we are

forced to the conclusion that the clear preponderance of the evidence is against the finding that they used the water after that date prior to 1897. Nothing less than 7 years' adverse use of the water in compliance with every condition of the statute is sufficient to establish a right by adverse use. It follows, therefore, that defendants' right to the use of the waters in question has not been sustained.

We are not unmindful of the fact that the honorable judge of the trial court viewed the premises and the ditch in question at the close of the trial. If the ditch, when he viewed it, had been in the same condition that it was from 1890 to 1897 his conclusions therefrom would have been entitled to much more weight. But such was not the case. He saw it after it had been enlarged and in more or less use during the last 25 years. He also knew where the ditch was located and where to look for it when he went to view the premises. The conditions were in many respects entirely different from what they were when the plaintiffs' witnesses saw the locality during the period between 1890 and 1897. Notwithstanding every reasonable presumption that should be indulged in favor of the findings of the court in such circumstances, we are nevertheless of the opinion that the finding in favor of the defendants as to their adverse use of the water from 1890 to 1897 is against the clear preponderance of the evidence.

In view of this conclusion, it is unnecessary to consider other errors assigned.

Judgment of the trial court is reversed and the cause remanded for a new trial solely on the question of adverse use. Neither party to recover costs on appeal.

STRAUP and HANSEN, JJ., and McCREA, District Judge, concur.

CHERRY, J., being disqualified, did not participate.

FRICK, J., died before decision announced.